AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Alabama

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

The premises located at 1160 Laurel Brook Lane,
Montgomery, Alabama 36117, including all buildings,
structures, storage facilities, and other artifices located,
along with electronic devices, at that address.

)
)
)
)
)

Case No. 2:20mj173-SRW

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under
penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the
and give its location)*:
See Attachment A

located in the _____ Middle _____ District of _____ Alabama _____, there is now concealed *(identify the
person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 (a)(1) | Unlawful Distribution of a Controlled Substance |

The application is based on these facts:
See attached affidavit incorporated herein by reference and made part of this application.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Darryl Henton, SA, DEA
*Printed name and title*

Sworn to telephonically before me and signed on:

Date: _____ 07/20/2020 _____

_/s/ Susan Russ Walker_____
*Judge's signature*

City and state: MONTGOMERY, AL _____

SUSAN R. WALKER, U.S. MAGISTRATE JUDGE
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 1160 LAUREL BROOK LANE, MONTGOMERY, ALABAMA 36117, INCLUDING ALL BUILDINGS, STRUCTURES, STORAGE FACILITIES, AND OTHER ARTIFICES LOCATED, ALONG WITH ELECTRONIC DEVICES, AT THAT ADDRESS | Case No. 2:20-MJ-173-SRW |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Darryl W. Henton, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for the issuance of a warrant to search the commercial property described as the residence of Dr. D'Livro Lemat Beauchamp, located at 1160 Laurel Brook Lane, Montgomery, Alabama 36117, including all buildings, structures, storage facilities, and other artifices located at that address, as well as all electronic devices located at that address, in order to seize fruits, instrumentalities, and evidence related to possible violations of 21 U.S.C. §§ 841(a)(1) and 846.

2.     I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been a special agent of the Drug Enforcement Administration (DEA) since November of 1997. Prior to becoming a special agent, I was a state of Alabama, City of Mobile, Alabama police officer from November of 1985 to November of 1997. I also obtained a Bachelor of Science degree in criminal justice and a

master's degree in public administration from Troy State University in Troy, Alabama. Pursuant to my employment with the DEA, I have investigated criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections 1952 and 1956. I am familiar with, and have employed, all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant interviews, interrogation, and undercover operations.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed by Dr. D'livro Lemat Beauchamp and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested because the property to be searched is located within the district. See Fed. R. Crim. P. 41(b)(1).

## RELEVANT PROVISIONS

6. Based on my training and experience, and the training and experience of other DEA diversion investigators, special agents, and other law enforcement officers, I know that:

a. Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person knowingly or intentionally to distribute or dispense a controlled substance except as authorized by that subchapter.

2

b.      Pursuant to Title 21, United States Code, Section 822(a)(1) and (a)(2), and 21 C.F.R. § 1301.11 and other regulations, a person who distributes or dispenses any controlled substance, or who proposes to dispense any controlled substance, must obtain a registration from the DEA every three years.

c.      Under 21 C.F.R. § 1306.03, a prescription for a controlled substance may only be issued by a practitioner who is both authorized to prescribe in the jurisdiction in which she is licensed to practice her profession and registered with the DEA (unless otherwise exempt from registration).

d.      Under 21 C.F.R 1306.3(a)(1) and (2) and 21 C.F.R. § 1306.4(a), a prescription for a controlled substance is only valid if it has been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice. If a physician—even a holder of a DEA registration—issues a prescription and that prescription does not satisfy the above-recited criteria, then the prescription constitutes an unlawful distribution and dispensing of a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

e.      The Alabama Board of Medical Examiners (ABME) requires that a physician maintain a patient's complete treatment records (including evaluations, diagnoses, and prognoses) for a period of no less than ten years from the patient's last visit.

## PROBABLE CAUSE

### A.      Background Information

7.      I know, from the investigation described below, that Beauchamp is currently a physician licensed to practice medicine by the state of Alabama and practicing in Montgomery, Alabama. According to records maintained by the ABME, Beauchamp obtained his Alabama Medical License on or about August 28, 1996. Since that time, to the best of my knowledge, he

3

has practiced continuously in Alabama (with the exception of a brief respite from his practice during the COVID-19 pandemic).

8.      Based on a review of publicly available databases maintained by the Alabama Secretary of State, I know that, on or about July 7, 2003, someone registered with the state of Alabama Obelisk Healthcare, L.L.C. Currently, Beauchamp is the sole member and registered agent of Obelisk Healthcare, L.L.C. The address provided for the business is 4705 Woodmere Blvd., Montgomery, AL 36106. The original "Nature of Business" reported to the Secretary of State was: "PROMOTE/DISTRIBUTE/RECORD/MFG/RETAIL/SELL

CLOTHING/MUSICAL ITEMS." On or about April 20, 2011, according to the database, the purpose changed to "MEDICAL PRACTICES."

9.      I know, from review of DEA records, that, on or about January 15, 1997, the DEA assigned to Beauchamp DEA registration BB5182124. This registration has been continuously renewed since that date. The last renewal occurred on or about June 28, 2017. At the time of the renewal, the address provided to be associated with the DEA registration number was 4705 Woodmere Boulevard, Montgomery, Alabama 36106. According to the DEA records, with this registration number, Beauchamp is authorized by the DEA to prescribe drugs in schedules 2, 2N, 3, 3N, 4, and 5.

10.     I know, based on surveillance performed by an agent working with me, that Beauchamp currently practices at a building located at 4705 Woodmere Boulevard, Montgomery, Alabama 36106. The signage on the glass front door of the building lists the practice as "Obelisk Healthcare." I also know that, on the website for Obelisk Healthcare, L.L.C., obeliskhealthcare.com, Beauchamp is listed as the lead physician and the practice is

4

listed as being located at 4705 Woodmere Boulevard. This website remains currently accessible as of July 17, 2020.

11. The website (obeliskhealthcare.com) describes Obelisk Healthcare as being "designed to meet all your primary health care needs by providing routine and minor emergency care for the entire family." The website goes on to state that prospective patients "simply come in any time [they] need medical care." Based on this statement, I infer that, at least at the time the website was published, Beauchamp's practice was a primary care practice.

12. The website (obeliskhealthcare.com) describes Beauchamp as "a Board-Certified Physician of Urgent Care Medicine." It further states that Beauchamp "began practicing medicine in Montgomery, Alabama in 1996" and that "[h]e plays an active role in providing state-of-the-art services for primary and urgent care to the entire Montgomery, Alabama area."

13. I am not aware of Beauchamp practicing medicine in any location other than 4705 Woodmere Boulevard in Montgomery. However, I know that he also operates some form of medical-spa practice located at the same address—4705 Woodmere Boulevard. That business is referred to as "Symmetry MedSpa" and maintains a website for that business, symmetrymedspa.com. That website remains accessible as of July 17, 2020. According to the website for Symmetry MedSpa, the practice "provides everything from liposuction to laser hair removal, to treatments for cellulite and more." The website goes on to state that "Dr. D'livro Beauchamp, Medical Aesthetician, and his professional team provide expert services and treatments to give you a more youthful and rejuvenated appearance." I do not know how long Beauchamp has operated Symmetry MedSpa. Nothing on the website for Symmetry MedSpa indicates that, as part of his practice through that entity, Beauchamp provides long-term prescriptions for chronic pain conditions.

5

**B.    Identification of Beauchamp as a Potential Subject**

14.    During the fall and winter of 2019, I and other DEA and United States Department of Health and Human Services Office of Inspector General (HHS-OIG) special agents prepared for the trial of a Montgomery physician charged with unlawfully distributing controlled substances, health care fraud, and money laundering, Dr. Richard A. Stehl. See United States v. Richard A. Stehl, 2:18-CR-358-TFM-JTA (M.D. Ala.).

15.    During the course of preparing for that trial, agents working with me and I reviewed Prescription Drug Monitoring Program (PDMP) reports associated with patients who received the prescriptions that gave rise to the counts at issue at the trial.

16.    The PDMP database exists to store information about all controlled substances prescriptions filled or dispensed within Alabama. Pharmacists who fill prescriptions and physicians who dispense medications are required to make entries into the PDMP database whenever they dispense a controlled substance. The information that must be reported includes: (1) the patient's name; (2) the prescribing physician; (3) the type and quantities of controlled substances prescribed; and (4) the name of the dispensing pharmacy or physician. Accordingly, the PDMP database can be used to generate reports of all of the controlled substances prescriptions obtained at an Alabama pharmacy by a patient over a period of time—regardless of the issuing provider, type of drug, or filling pharmacy. Likewise, the database can generate reports describing all of the controlled substances prescriptions issued by a physician and filled at an Alabama pharmacy—regardless of the patient, filling pharmacy, or type of drug. In other words, the database is searchable by both patient and prescriber.

17.    Upon reviewing the PDMP reports associated with the patients whose prescriptions were going to be at issue in the Stehl trial, agents working with me and I observed

6

that one of the patients had received from another doctor—Beauchamp—prescriptions that were similar to those that the grand jury had indicated Stehl for issuing to that patient. Specifically, from January 31, 2014 through June 15, 2015, patient Paige O. received routine monthly prescriptions from Beauchamp for buprenorphine, a Schedule III controlled substance commonly prescribed to treat pain and opioid addiction. The grand jury indicted Stehl for prescribing Paige O. buprenorphine.

18.     Upon further investigation into the Stehl prescriptions issued to Paige O., agents working with me and I developed additional reasons to think that the Beauchamp prescriptions issued to Paige O. might have been illegitimate. For example, in a letter sent to the ABME and in the possession of the DEA, Stehl wrote that he had actually prescribed Paige O. less buprenorphine than had Beauchamp and that Stehl would never prescribe to a patient the amount of buprenorphine the patient was receiving from Beauchamp when she had begun seeing him. Additionally, I and agents working with me interviewed Paige O. During that interview, she stated that she had stopped seeing Beauchamp and started to see Stehl because Beauchamp was charging her around $250 per appointment.

19.     Additionally, another Stehl patient, Ann L. stated that she too had seen and been prescribed controlled substances by Beauchamp before starting to see Stehl. This was significant to me, as an independent expert physician had identified the controlled substances Ann L. received as a result of Stehl prescriptions as being potentially hazardous to her health.

20.     In light of these discoveries, I decided that, once the Stehl trial had concluded, I would consider opening an investigation of Beauchamp. On December 19, 2019, the jury convicted Stehl on all 101 counts charged, including each of the drug distribution counts involving prescriptions issued by Stehl to patients Paige O. and Ann L.

7

## C. February 10, 2020 Initial Receipt of Intelligence from Source of Information

21. After the conclusion of the Stehl trial, I spoke with an investigator employed by the ABME. During that conversation, I asked the investigator whether the ABME had or was currently conducting an investigation of Beauchamp. The investigator informed me that in fact, he had recently received a call from a source of information who was in a unique position to provide intelligence about Beauchamp's medical practice. Based on his receiving of this information, the investigator had opened an investigation of Beauchamp.

22. Subsequently, on February 10, 2020, I spoke, over the telephone, with this person in a unique position to provide intelligence about Beauchamp's medical practice. I will refer to this person, throughout the remainder of this affidavit as "SOI-1."[1] During the telephone call, SOI-1 stated that she/he wished to provide information about Beauchamp and his practice, which she/he identified as being located at 4705 Woodmere Boulevard, Montgomery, Alabama 36106. She/He stated that Beauchamp practices at this location and that he is the only physician who does so. At his practice, according to SOI-1, Beauchamp prescribes Schedule II opioid controlled substances, including oxycodone. Beauchamp issues prescriptions by sending electronic prescriptions directly to pharmacies using a secure e-prescription platform. Additionally, SOI-1 stated that Beauchamp stores medical records associated with the care he provides his patients in three-different electronic health records platforms.

23. SOI-1 stated that she/he wished to inform law enforcement that Beauchamp was issuing controlled substances prescriptions to friends, fraternity brothers of his, and girlfriends of his fraternity brothers, even though most of these recipients of prescriptions were not coming to the office for examinations before receiving prescriptions. Additionally, Beauchamp was not

[1]After February 10, 2020, SOI-1 became a DEA informant. She/He has since been deactivated. To be clear, at the time SOI-1 provided initial information about Beauchamp, she/he was not a DEA informant.

8

maintaining medical records associated with the treatment—by "treatment," I mean prescriptions—he was providing to these persons. SOI-1 stated that some of these persons had no medical files at all in any of the databases associated with Beauchamp's practice. Others, said SOI-1, did have files, but those files did not indicate that the patient had been seen by Beauchamp in years. Moreover, SOI-1 stated that these persons' names did not appear on sign-in sheets because they did not come to the office before receiving controlled substances prescriptions. Instead, Beauchamp electronically sent to the pharmacies prescriptions for these persons without the persons ever coming to the practice.

24.     SOI-1 provided the names of six individuals who received controlled substances prescriptions in this manner—in other words, without coming to the office and without, in the view of SOI-1, being a "patient" in the typical sense. Those people were: G.R. , J.P. , J.P. , W.P. , L.B. , and M.D. . SOI-1 also named S.M. S.M. as one of these patients. However, according to SOI-1, S.M. did occasionally come by the office. SOI-1 stated that S.M. lives in Atlanta.

25.     SOI-1 stated that pharmacies sometimes called the office and sought to verify prescriptions issued to the above-named individuals and other persons who received controlled substances prescriptions in this manner. According to SOI-1, when a pharmacy called seeking to verify a prescription issued to a "friend" of Beauchamp's (i.e., a fraternity brother, significant other fraternity brother, or some other person having an out-of-office relationship with Beauchamp), Beauchamp personally spoke with the representative of the pharmacy and authorized the prescription.

9

26.     During the call, SOI-1 identified the following three companies as being used by Beauchamp and Obelisk Healthcare to maintain medical records electronically: (1) Spring Charts; (2) Practice Fusion; and (3) Patient Now.

27.     During the interview, SOI-1 also stated that Beauchamp issued prescriptions for buprenorphine (a Schedule III controlled substance used to treat, among other things, opioid addiction) and phentermine (a Schedule IV controlled substance used to treat, among other things, obesity), without ever seeing patients. Rather, medical assistants saw and evaluated patients and recommended prescriptions to Beauchamp and Beauchamp then issued the prescriptions—without ever examining or interviewing the patients or reviewing the patients' medical records.

28.     I know from my training and experience that it would be outside the normal course of professional medical practice for a physician to issue prescriptions for controlled substances without ever seeing the patient in a medical office, examining, evaluating, or maintaining a medical file on the patient. I also know that it would be outside the normal course of professional practice for a physician to delegate to a medical assistant (who does not necessarily have even an associate's degree) the authority to, in effect, examine a patient and prescribe a controlled substance like buprenorphine or phentermine.

**D.      Evaluation of Criminal Histories and PDMP Reports of February 10, 2020 Patients**

29.     After receiving the telephone information from SOI-1, I and other agents working with me obtained criminal history information and PDMP reports associated with each of the six individuals identified by SOI-1 as receiving prescriptions from Beauchamp without coming to Beauchamp's office and being examined. I obtained criminal history information because I believed, based on my training and experience, that SOI-1's information suggested that

10

Beauchamp may be—knowingly or unknowingly—furnishing controlled substances that are then resold to others. In my training and experience, those who obtain controlled substances through illegitimate prescriptions sometimes resell the controlled substances they obtain. I also know that such people sometimes have prior criminal histories. I obtained PDMP reports associated with those persons in order to verify whether Beauchamp was in fact prescribing controlled medications to those persons. The following summarizes the information I obtained about each patient.[2]

1. G.R.

30. G.R. has a date of birth of 1986. According to state records, he resides in Montgomery, Alabama.

31. On May 5, 2011, G.R. was arrested by the Montgomery County Sheriff's Office for first-degree possession of marijuana. The case is listed as pending in a federal database.

32. On March 17, 2013, G.R. was arrested by the Montgomery County Sheriff's Office for selling or furnishing liquor to a prohibited person. The federal database does not list a disposition for that matter.

33. On July 19, 2018, G.R. was arrested by the Georgia State Patrol for driving under the influence of alcohol.

34. As for the PDMP, the PDMP records showed that, on or about February 25, 2016, G.R. first obtained from Beauchamp a prescription for 90 30-milligram oxycodone tablets. Oxycodone is a Schedule II opioid commonly used to treat pain. Between that date and March 26, 2020, Rogers obtained 33 additional prescriptions from Beauchamp. Each prescription was

---

[2]For ease of reference, a chart summarizing the PDMP data and the criminal history information for each relevant patient can be found at Attachment C.

for 90 30-milligram oxycodone tablets. With a few exceptions, these prescriptions appeared to have been issued monthly. ██G.R.██ filled all prescriptions at the same pharmacy.

35.     The PDMP report did not reflect that ██G.R.██ had received any prescriptions for any controlled substances from any prescriber other than Beauchamp during the preceding four years. This is significant to me because, typically, if a prescription is legitimate, multiple doctors may have issued the same prescription to the patient over a four-year period. This might occur when a patient transfers from one doctor to another and seeks to remain on the medication provided by the previous doctor. Or, it might occur when the patient's regular doctor is out of town or otherwise unavailable at the time the patient needs a refill on his or her medication. On the other hand, if a prescription is illegitimate—meaning the patient does not really have a legitimate medical need for the medication—then it is less likely that another doctor will prescribe the same medication to the patient.

**2.**     ██J.P.██

36.     ██J.P.██ has a date of birth of ████ 1990.

37.     According to criminal history records, ██J.P.██ has previously been arrested for third-degree assault, menacing, obstructing justice by trying to elude police, and third-degree domestic violence. He has only been convicted of third-degree assault.

38.     According to the PDMP report, beginning on November 27, 2017, ██J.P.██ ██J.P.██ received almost-monthly prescriptions from Beauchamp for 90 30-milligram oxycodone tablets. In total, he received 28 such prescriptions between that date and the most recent date on which he received such a prescription from Beauchamp, April 6, 2020. ██J.P.██ filled those prescriptions at three different pharmacies. This is significant because, as I know from my training and experience, people who obtain controlled substances through

medically illegitimate prescriptions often take those prescriptions to multiple pharmacies so as to avoid raising the physician of any single pharmacist or pharmacy.

39.     During the last four years, the only other controlled substances prescriptions J.P. received—from any prescriber in Alabama—were: (1) a November 15, 2016 prescription from Beauchamp for 60 30-milligram dextroamphetamine-amphetamine (a stimulant commonly prescribed to treat attention deficit hyperactivity disorder) tablets; and (2) a May 20, 2018 prescription for 30 10-milligram oxycodone tablets from nurse practitioner Ginger McDougal, a prescriber who does not appear to be associated with Beauchamp.

**3.**     W.P.

40.     W.P. has a date of birth of 1959.

41.     According to criminal history records, W.P. has a 1984 conviction for first-degree theft of property and a 1990 conviction for first-degree theft of property.

42.     According to the PDMP report, beginning on January 26, 2018, W.P. began receiving prescriptions for 90 30-milligram oxycodone tablets from Beauchamp. After that date, Beauchamp issued 26 such prescriptions to W.P. —issuing approximately one per month. The most recent prescription was issued by Beauchamp to W.P. on March 23, 2020. W.P. filled those prescriptions at five different pharmacies.

43.     During this period, from January 26, 2018 to January 24, 2020, W.P. has only filled two other controlled substances prescriptions in Alabama, according to the report, namely two September 17, 2018 prescriptions, each for 50 50-milligram tramadol (a Schedule IV opioid controlled substance used to treat pain) tablets issued by Dr. Alfred Newman.

44.     Before January 26, 2018, during the period between January 15, 2016 and August 30, 2017, W.P. received oxycodone prescriptions from Dr. Jose Juan Chung,

13

according to the report. These prescriptions were generally for 60 30-milligram tablets—instead of the 90 30-milligram tablets prescribed by Beauchamp. I know, based on my experience, that during the time Dr. Chung was issuing prescriptions to          W.P.          , Dr. Chung was practicing at Family Practice, the practice of Dr. Gilberto Sanchez. I conducted an investigation of Dr. Sanchez and the other prescribers practicing at Family Practice. Dr. Chung was not charged with any unlawful activity as a result of that investigation. However, Dr. Sanchez and other providers practicing with him were convicted of drug-related offenses. Dr. Sanchez is presently serving a 145-month sentence.

4.    L.B.

45.          L.B.          a date of birth of          , 1982.

46.    According to criminal history records, on September 16, 2006,          L.B.          was arrested by the DeKalb County, Georgia Police Department and charged with misdemeanor battery. The database does not state the disposition of this case.

47.    According to the PDMP,          L.B.          began receiving prescriptions from Beauchamp for 90 30-milligram oxycodone tablets on October 26, 2018. Since that time, he received an identical prescription every month, with the most recent prescription being issued by Beauchamp on April 16, 2020. In total,          L.B.          received 19 such prescriptions from Beauchamp. He filled those prescriptions at four different pharmacies.

48.    The October 26, 2018 prescription from Beauchamp was the earliest controlled substances prescription filled in Alabama by          L.B.          in the last four years. However, since that time,          L.B.          has also filled six prescriptions for various amounts of hydrocodone-acetaminophen (a Schedule II opioid commonly used to treat pain). Each prescription was written by Dr. Albert E. Lester of Montgomery. Dr. Lester issued these

14

hydrocodone prescriptions during the same period of time that ⬛ L.B. ⬛ was receiving oxycodone prescriptions from Beauchamp.

**5.** ⬛ M.D. ⬛

49. ⬛ M.D. ⬛ has a date of birth of ⬛ 1995.

50. I could find no reported criminal history associated with ⬛ M.D. ⬛.

51. According to the PDMP report, on November 1, 2018, ⬛ M.D. ⬛ received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. This was the first prescription for any controlled substance reported in the four-year PDMP history report on ⬛ M.D. ⬛. Thereafter, Davis received 17 identical prescriptions from Beauchamp, with the prescriptions being issued roughly once per month. The most recent prescription reported is dated March 20, 2020. He filled those prescriptions at five different pharmacies.

52. The PDMP database does not reflect ⬛ M.D. ⬛ filling any other prescriptions for any other controlled substances in Alabama in the last four years.

**6.** ⬛ S.M. ⬛

53. ⬛ S.M. ⬛ has a date of birth of ⬛, 1981.

54. According to criminal history records, on March 9, 2004, ⬛ S.M. ⬛ was arrested in Montgomery, Alabama and charged with first-degree theft of property.

55. According to the PDMP report for the last four years, ⬛ S.M. ⬛ first received a prescription from Beauchamp on March 7, 2016. That prescription was for 90 30-milligram oxycodone tablets. After that time, ⬛ S.M. ⬛ received 41 identical prescriptions. The most recent one was issued by Beauchamp on March 31, 2020. Beauchamp issued these prescriptions on a roughly monthly basis, with the exception that Beauchamp did not issue her any such

15

prescriptions between September 27, 2019 and February 14, 2020. She filled those prescriptions at seven different pharmacies.

56. During the past four years, S.M. has not filled any prescriptions for controlled substances in Alabama that were not issued by Beauchamp. However, according to SOI-1, S.M. resides in Georgia. I am unaware as to whether S.M. has filled prescriptions at Georgia pharmacies for controlled substances. I do know, however, based on my training, that it is a red flag for unlawful prescribing when a patient travels from out of state month after month to obtain a controlled substance prescription from a prescriber. This is so because, if the out-of-state patient has a legitimate need for a medication, then one would assume that the patient would get the prescription from a physician in the patient's state of residence.

### Conclusions

57. Based on my review of the criminal history records and PDMP database, I concluded that SOI-1 had provided reliable information. I found it significant that: (1) each patient had received routine prescriptions for the exact same type and quantity of medication; (2) all but one of the patients had not received the medications before being started on the medication by Beauchamp; (3) all but one of the patients was under 40 years old, which is significant because, in past investigations, I have learned that younger people typically do not have chronic pain; and (4) all but one of the patients had a criminal record.

58. It was also very significant to me that all of the prescriptions were for 30-milligram oxycodone tablets. I know that oxycodone is manufactured in varying dosage levels ranging from 5-milligram tablets to 30-milligram tablets. It was significant that all of these patients were receiving the highest dosage level. I also noted that, in no instance, did the PDMP indicate that Beauchamp started a patient at a dosage level below 30-milligrams. In my

16

experience, most legitimate prescribers start patients at lower-strength dosage levels and then gradually increase the strength of a medication if the lower-strength medication does not appear to be working. It did not appear that Beauchamp had done this when treating any of these patients.

**E. February 18, 2020 Interview with Source of Information**

59. On February 18, 2020, I, along with other agents working with me and two Assistant United States Attorneys met with SOI-1 at the United States Attorney's Office in Montgomery.

60. During the interview, SOI-1 repeated the allegations she/he previously made regarding Beauchamp.

61. She/He also further explained Beauchamp's use of medical records. She/He stated that physical, paper files are maintained at the office for all patients. She/He reported that information is transcribed, by a staff member, from the paper file into an electronic medical record platform. She/He went on to state that: (1) from an unknown date, the practice used the electronic health records platform, Spring Charts, to store electronic health records; (2) starting around January 2017, the practice switched from Spring Charts to Practice Fusion to store electronic health records and this platform was used by the practice from in or around January 2017 until in or around September 2019; and (3) in or around September 2019, the practice switched from Practice Fusion to Patient Now for its electronic records storage and this platform is currently in use. According to SOI-1, each time the practice switched electronic health records platforms, the only information migrated from one platform to the other was patient identifying information. Information about medical office visits that occurred before the switching to a new platform was not moved from the old platform to the new platform. In other words, to determine

17

whether there is a medical record to support a prescription issued by Beauchamp in 2016, one would have to look in the Spring Charts database—such information would not exist in Practice Fusion or Patient Now. Likewise, information about a prescription issued in 2018 could only be found in Practice Fusion.

62.      SOI-1 went on to state that electronic prescribing is done through the electronic health records platform currently in use. Therefore, from in or about January of 2017 until in or about September of 2019, all electronic prescribing was done through Practice Fusion. However, since September of 2019, electronic prescribing for most patients has moved to Patient Now. Nevertheless, according to SOI-1, when issuing a prescription for a "friend"—one of the people described above who gets a prescription for a controlled substance without having to come to the office—Beauchamp continues to use the Practice Fusion system. Beauchamp does so, according to SOI-1, because he knows that the office staff is not accessing the Practice Fusion system on a routine basis anymore and therefore cannot monitor what he is doing. Additionally, SOI-1 made clear that an electronic prescription cannot be done—through any computer system—without Beauchamp himself entering a code into either his phone or a computer. Therefore, according to SOI-1, there is no way that the prescriptions described in this affidavit could be issued without Beauchamp's knowledge and consent.

63.      SOI-1 also stated that, sometimes pharmacies or insurance companies would request to know the diagnoses associated with prescriptions Beauchamp was issuing to his "friends." Whenever this would occur, Beauchamp would state that the diagnosis was "low back pain." I know from my training and experience that "low back pain" is a diagnosis commonly used by physicians to justify illegitimate prescriptions for pain medications like oxycodone. This

18

is done because it can be difficult, even for a legitimate doctor, to diagnose a cause of low back pain.

64. SOI-1 added that, when "friends" of Beauchamp came to the practice, from time to time, staff members would question who the people were and why they were there. Beauchamp would respond, "If I tell you to let someone in, get them in."

65. SOI-1 further stated that, in the summer of 2018, Beauchamp stopped being a primary care and urgent care physician. He wanted to become a "med spa." As such, he began to focus on: breast implants, tummy tucks, esthetics, and liposuction. He also began to operate a gift shop in his practice where he sold scented candles and handbags and hired an esthetician who does, among other things, facials. Based on this information, it does not appear that Beauchamp should be prescribing monthly, long-term prescriptions for pain medications.

66. Finally, SOI-1 provided names of additional people who were, according to her, receiving from Beauchamp routine prescriptions for 90 30-milligram oxycodone tablets without having to be seen as patients and without having files. Such people were: L.D. , K.K. , D.H. , J.C. , D.B. , T.S. , D.D. , D.D. , A.F. , D.W. , T.C. , and D.G. .

**F.  Evaluation of Criminal Histories and PDMP Reports of February 18, 2020 Patients**

67. Thereafter, I and agents working with me obtained and evaluated criminal history and PDMP reports associated with 11 of the patients identified by SOI-1 during the February 18, 2020 interview. The following summarizes my findings (so as to better account for the total number of patients identified by SOI-1, I am continuing the numbering started above). There were two patients identified by SOI-1 as receiving prescriptions from Beauchamp in the above-

19

described manner for whom I and the agents working with me were unable to locate any criminal history or PDMP records.

7.        L.D.

68.        L.D.     has a date of birth of     1990. According to state records, he resides in Montgomery.

69.     The criminal history report did not identify any criminal history associated with L.D. .

70.     The PDMP report stated that on February 16, 2018,    L.D.    received two prescriptions from Beauchamp, each for 90 30-milligram oxycodone tablets. Thereafter, L.D. proceeded to receive approximately monthly prescriptions identical to the February 16, 2018 prescriptions. Beauchamp issued the most recent prescription to   L.D.   L.D. on April 21, 2020. In total, Beauchamp has issued 28 such prescriptions to this patient. L.D. has filled those prescriptions at six different pharmacies.

71.     According to the PDMP report,    L.D.    received only one other prescription for a controlled substance in the past five years—a May 18, 2016 prescription for 12 five-milligram hydrocodone tablets issued by Dr. Nima Bahraini. A review of publicly available information suggests that Dr. Bahraini is an emergency room physician. Based on this information, and the two year gap in time between the hydrocodone prescription and the prescriptions issued by Beauchamp, this does not suggest that Beauchamp was continuing any other doctor's treatment when he began prescribing oxycodone to    L.D.    .

72.     During the period    L.D.    received prescriptions for controlled substances from Beauchamp, he did not receive any other controlled substances prescriptions from any other Alabama prescribers.

20

8.    K.K.

73.    K.K.    has a date of birth of          1980.  According to state

records, he resides in Montgomery.

74.    The criminal history report did not identify any criminal history associated with K.K. .

75.    The PDMP report documenting    K.K.    prescriptions for the past five years stated that, on June 8, 2018, K.K. received from Beauchamp a prescription for 90 30-milligram oxycodone tablets.  K.K. has continued to receive such prescriptions on an approximately monthly basis since that time.  The most recent prescription was issued by Beauchamp on March 28, 2020.  In total, K.K. received 22 identical prescriptions from Beauchamp.  K.K. has filled all prescriptions at the same pharmacy.

76.    During the five-year period covered by the report, K.K. also filled:  (1) a July 29, 2016 prescription issued by Dr. Jacob Griffin, a dentist who practices in Montgomery, according to publicly available information, for 15 acetaminophen-codeine #3 (a Schedule III opioid used to treat mild to moderate pain) tablets; (2) a March 30, 2017 prescription for 20 7.5-milligram hydrocodone tablets written by Dr. Richard Kean, a Montgomery oral surgeon according to publicly available information; (3) a July 7, 2018 prescription for 42 10-milligram hydrocodone tablets written by Dr. Hadryan H. Vaughn, a Montgomery podiatrist according to publicly available information; and (4) a March 20, 2019 prescription for 15 acetaminophen-codeine #3 tablets written by Dr. Griffin.  In light of the fact that each of these other prescriptions came from a specialist and each prescription appeared to authorize only small supplies of medicine issued on non-recurring bases, these other prescriptions may be unrelated to the prescriptions issued by Beauchamp to K.K. .

21

9. ████ D.H. ████

77. ████ D.H. ████ has a date of birth of ████, 1981. According to state records, he resides in Grady, Alabama.

78. According to criminal history records, since March 19, 2014, ████ D.H. ████ has been arrested on four occasions for third-degree theft of property.

79. As for the five-year PDMP report, on January 26, 2018, ████ D.H. ████ first received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. After that time, he received another identical prescription from Beauchamp approximately once each month. In total, he has 28 such prescriptions. Beauchamp issued the most recent identical prescription on April 10, 2020. ████ D.H. ████ has filled those prescriptions at five different pharmacies.

80. The five-year PDMP report does not reflect that ████ D.H. ████ has filled, in Alabama, any other prescriptions for controlled substances from any other prescribers during the past five years.

10. ████ D.B. ████

81. ████ D.B. ████ has a date of birth of ████ 1988. According to state records, he resides in Montgomery.

82. According to the criminal history report, ████ D.B. ████ has prior state and local arrests for possession of controlled substances, third-degree assault, third-degree domestic violence, and a violation of the family protection act. The report is inconclusive as to whether ████ D.B. ████ was ever convicted of any of these offenses.

83. As for the five-year PDMP report for ████ D.B. ████, that report indicates that, on October 22, 2018, ████ D.B. ████ received his first prescription from Beauchamp for 90 30-milligram oxycodone tablets. After that date, Brown received an identical prescription each month. His

most recent identical prescription he received from Beauchamp on March 9, 2020. In total,

D.B. received 19 such prescriptions. D.B. has filled those prescriptions at five different pharmacies.

84.     In addition to these 17 prescriptions, D.B. has filled, in the last five years: (1) a May 21, 2018 prescription for 50 7.5 hydrocodone tablets written by Dr. Eric Buczek, who appears, based on a notation on the PDMP report, to be a physician at the University of Alabama – Birmingham Hospital; (2) a June 28, 2018 prescription for 24 5-milligram hydrocodone tablets written by Dr. Sravani Bantu, an internal medicine physician in Montgomery; and (3) a July 6, 2018 prescription for 24 5-milligram hydrocodone tablets written by Ginger McDougal, as noted previously, a Montgomery nurse practitioner. It is significant to me that D.B. received prescriptions for Schedule II opioids from four different prescribers (Buczek, Bantu, McDougal, and Beauchamp) within a six-month period. In my experience, patients who are seeking controlled substances for illegitimate reasons often go from doctor to doctor trying to obtain such prescriptions. I also find it significant that, once Brown started getting prescriptions from Beauchamp, he appears to have stopped engaging in the practice of going to multiple doctors and obtaining opioids.

    11.     J.C.

    85.     J.C.            has a date of birth of         , 1984.  According to state records, he resides in Montgomery.

    86.     According to the criminal history report, J.C. has an August 20, 2009 arrest by the Montgomery Police Department for second-degree possession of marijuana.

    87.     As for the five-year PDMP report, on December 12, 2018, J.C. first received a prescription from Beauchamp for 60 30-milligram oxycodone tablets. The following month,

23

on January 16, 2019, J.C. received a prescription for 90 30-milligram oxycodone tablets. After that, J.C. began to receive 90 30-milligram oxycodone prescriptions each month. He received his most recent such prescription on April 17, 2020. In total, J.C. received one 60-tablet prescription and 16 90-tablet prescriptions. J.C. has filled all prescriptions at the same pharmacy.

88.     The five-year PDMP report does not reflect that J.C. has filled, in Alabama, any other prescriptions for controlled substances from any other prescribers during the past five years.

12.     T.S.

89.     T.S. has a date of birth of         , 1982. According to state records, she resides in Montgomery.

90.     The criminal history report did not identify any criminal history associated with Shaver.

91.     As for the PDMP report, this report indicated that, on October 23, 2018, T.S. received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. After that, she received an identical prescription each month. Beauchamp issued the most recent prescription to her on April 13, 2020. In total, T.S. received 19 such identical prescriptions. T.S. has filled those prescriptions at six different pharmacies.

92.     The five-year PDMP report also showed that T.S. received, on March 30, 2016, a prescription for 14 50-milligram tramadol tablets. This prescription came from Dr. Landon E. Argo. According to publicly available information, Dr. Argo is an emergency room physician. Given this fact, the fact that the prescription was a small dosage, and the fact that it was issued approximately 2.5 years before the first prescription from Beauchamp, the prescription from Dr.

24

Argo does not appear to be a part of the same course of treatment as the treatment provided by Beauchamp. Other than the prescription written by Dr. Argo, the PDMP report does not indicate that Shaver filled any other prescriptions in Alabama for controlled substances.

**13.** D.D.

93. D.D. has a date of birth of , 1988. According to state records, he resides in Montgomery.

94. The criminal history report showed that D.D. had prior convictions in Alabama state court for third-degree burglary, second-degree theft of property, and first-degree theft of property. The report further showed that D.D. had spent some time in the custody of the Alabama Department of Corrections.

95. According to the five-year PDMP report, on July 27, 2018, D.D. received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. D.D. did not receive another prescription in August 2018. He did receive an identical prescription on September 21, 2018 from Beauchamp. Thereafter, he began to receive an identical prescription each month from Beauchamp. He last received such a prescription on March 31, 2020. In total, D.D. , on 20 occasions, received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. D.D. has filled those prescriptions at five different pharmacies.

96. Additionally, D.D. received: (1) a September 18, 2016 prescription for 16 50-milligram tramadol tablets from Dr. Shakira Thomas, who appears to be, based on publicly available information, a Montgomery emergency room physician; (2) a March 20, 2017 prescription for 12 7.5-milligram hydrocodone tablets written by Dr. Thomas J. Decaro, an emergency medicine doctor in Rock Hill, South Carolina, according to publicly available documents; and (3) a February 24, 2018 prescription for 8 7.5-milligram hydrocodone tablets

25

from Dr. Patrick M. Jackson, an emergency medicine doctor in Charlotte, North Carolina according to publicly available information. Each prescription was a short-term prescription issued by an emergency room doctor, thus, possibly unrelated to the prescriptions Beauchamp wrote. Moreover, it appears to be significant that [D.D.] did not obtain any controlled substances prescriptions after he began to receive prescriptions from Beauchamp.

14. [A.F.]

97. [A.F.] has a date of birth of [ ], 1985. According to state records, he resides in Montgomery.

98. According to state law enforcement records, [A.F.] was arrested on May 6, 2003 for felony possession of burglar's tools. The records do not indicate that [A.F.] was convicted of this offense.

99. Turning to [A.F.] five-year PDMP report, on July 25, 2018, [A.F.] received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. From that point on, [A.F.] received an identical prescription each month from Beauchamp. He last received such an identical prescription on March 20, 2020. [A.F.] has filled those prescriptions at five different pharmacies.

100. The report does not indicate that, before July 25, 2018, [A.F.] ever before filled a prescription for a controlled substance in Alabama. During the period he was filling prescriptions issued by Beauchamp, [A.F.] did also fill an August 26, 2018 prescription for 10 50-milligram tramadol tablets written by Dr. Neil L. Christen, an emergency medicine doctor in Anniston, Alabama, according to publicly available information. It is unclear whether this prescription is related to those issued by Beauchamp.

15. [D.W.]

26

101. **D.W.** has a date of birth of , 1984. According to state records, he resides in Montgomery.

102. The criminal history database did not indicate that **D.W.** had any prior criminal history.

103. According to the five-year PDMP report, Beauchamp first wrote **D.W.** a prescription on March 26, 2018. That prescription was for 90 30-milligram oxycodone tablets. After that, Beauchamp wrote **D.W.** an identical prescription exactly once each month. The most recent identical prescription was issued on April 17, 2020. In total, Beauchamp has issued **D.W.** 26 such identical prescriptions. **D.W.** filled those prescriptions at seven different pharmacies.

104. The PDMP report also indicated that **D.W.** received, in 2016, three short-term (two- or three-day) prescriptions for hydrocodone. These prescriptions were issued by physicians other than Beauchamp. And, in January of 2019, while he was receiving the prescriptions from Beauchamp, **D.W.** received a 1-day prescription for five oxycodone tablets from Dr. Brian N. Hassani, a Birmingham emergency medicine physician.

**16.** **T.C.**

105. **T.C.** has a date of birth of , 1984. According to state records, she resides in Montgomery.

106. The criminal history database did not indicate that **T.C.** had any prior criminal history.

107. According to the PDMP report, on December 11, 2017, **T.C.** received her first prescription from Beauchamp—a prescription for 80 30-milligram oxycodone tablets. The next month, on January 9, 2018, she received another prescription from Beauchamp—a

27

prescription for 90 30-milligram oxycodone tablets. Thereafter, T.C. received a prescription for 90 30-milligram oxycodone tablets each month, with the most recent prescription having been issued on June 4, 2019—except that there was no prescription issued by Beauchamp in October of 2018. In total, T.C. received 18 prescriptions for oxycodone from Beauchamp—17 of which were 90-tablet prescriptions and 1 of which was an 80-tablet prescription. T.C. filled those prescriptions at three different pharmacies.

108.    The PDMP report did not reflect that T.C. filled any other controlled substances prescriptions in Alabama in the last five years.

**17.**    D.G.

109.    D.G. has a date of birth of 1984. Federal records suggest that he resides in Montgomery. However, I recently viewed what appeared to be D.G. Facebook account. I know that the account was his because the photograph on the account matched the photographs associated with his criminal history records. The Facebook account indicated that D.G. is currently residing in San Antonio, Texas. Federal records also indicate that, when he resided in Montgomery, D.G. worked at Maxwell Air Force Base. Moreover, according to Department of Defense information obtained during the course of the investigation, D.G. duty station is presently San Antonio.

110.    According to criminal history records, D.G. has a prior federal conviction for driving under the influence of alcohol on federal territory. See United States v. Deandre Gross, 4:12-MJ-201-MSH (M.D. Ga.). For that offense, he received 12 months of probation.

111.    According to the PDMP report, on March 7, 2016, D.G. received his first prescription from Beauchamp—a prescription for 90 30-milligram oxycodone tablets. Thereafter, D.G. received an identical prescription from Beauchamp almost once each month.

28

His received his most recent such prescription from Beauchamp on March 17, 2020. In total, D.G. received 43 such prescriptions from Beauchamp. He filled those prescriptions at five different pharmacies—all within the Montgomery area. This is significant to me, given that he appears to be presently residing in San Antonio.

112.    The PDMP report did not reflect that D.G. filled any other controlled substances prescriptions in Alabama in the last five years.

### Conclusions

113.    Based on the above-recounted information, it appears that the information provided by SOI-1 was further corroborated. Each of the people she/he identified for whom we were able to find records did in fact receive steady prescriptions from Beauchamp for controlled substances. Moreover, the prescriptions were almost identical, and almost always monthly. Furthermore, of the 10 additional individuals listed, all were under 40 and five had past arrests.

## G.    Issuance of Search Warrants for and Acquisition of Electronic Evidence

114.    On February 21, 2020, a magistrate judge of this Court issued three search warrants authorizing the seizure of electronic evidence related to the above-described case. Each search warrant requested electronically stored patient files related to Beauchamp's treatment of 16 of the 17 individuals listed above (the warrant did not request the records of         D.G.         ). One search warrant was directed to Spring Charts (the electronic records provider from an unknown date until January of 2017, according to SOI-1). The second was directed to Practice Fusion (the electronic records provider from January of 2017 until in or around September of 2019, according to SOI-1). The third was directed to Patient Now (the electronic records provider from in or around September of 2019 to the present, according to SOI-1). I and agents working with me served each search warrant on or about February 24, 2020.

29

115.    On or about February 25, 2020, I received correspondence from Spring Charts stating that Spring Charts was not in possession of any records responsive to the search warrant. According to the president of the company, Spring Charts did have a business relationship with Beauchamp and/or Obelisk Healthcare, L.L.C. However, that business relationship did not allow Beauchamp or the business to store medical records on any cloud-based server accessible by Spring Charts. Rather, according to company records, all records storage was done on some other server, perhaps a server maintained at Beauchamp's office.

116.    On or about March 6, 2020, I received from Practice Fusion, copies of electronic records in the business's possession that were responsive to the search warrant. These records, according to Practice Fusion, were associated with Beauchamp and were maintained on a Practice Fusion cloud-based server.

117.    On or about June 17, 2020, I received records from Patient Now. These records, according to Patient Now, were associated with Beauchamp and were maintained on a Patient Now cloud-based server.

## H.    March 2, 2020 Telephone Call from Source of Information

118.    On March 2, 2020, I received a telephone call from SOI-1. During that call, SOI-1 stated that a patient of Beauchamp's, ⬛ M.C. ⬛, met with Beauchamp at Beauchamp's office that day. SOI-1 stated that ⬛ M.C. ⬛ is a weight loss and oxycodone-receiving patient of Beauchamp's. SOI-1 stated that Beauchamp requested an employee, Sarah, to create a medical file for ⬛ M.C. ⬛. After the medical file was created, Beauchamp took the file into his office within the building.

30

119.    SOI-1 also stated that Beauchamp had recently asked her/him to start seeing Suboxone patients. SOI-1 had responded to Beauchamp that she/he was not going to falsify medical records.

## I.    March 5, 2020 ABME Call with Pharmacist and April 7, 2020 DEA Interview of Pharmacist

### 1.    March 5, 2020 ABME Call

120.    On or about March 5, 2020, I received from an investigator employed by the ABME a recording. On that recording, I heard the ABME investigator participate in a telephone conversation with Kelly Pickard, a Montgomery-area pharmacist. The recording suggested that Pickard had telephoned the ABME and asked for someone to return her call. The recording was of the investigator returning the call of Pickard.

121.    At the beginning of the call, Pickard stated that she had developed "questions" about oxycodone prescriptions coming from Beauchamp and therefore had telephoned Beauchamp's office. Specifically, she was concerned about a prescription to a patient, P.A. P.A. , because there was no PDMP history of P.A. having ever received oxycodone before. Pickard said that she spoke with Beauchamp briefly when she called and he was unable to explain the prescription. She also said that, according to the receptionist, the practice was a "med spa" and that it was not a pain management clinic. However, Beauchamp then told Pickard that he was certified as a pain doctor. Accordingly, Pickard was calling the ABME to confirm whether Beauchamp was a pain management doctor, in light of the frequency of Beauchamp prescribing maximum-strength oxycodone doses.

122.    Pickard also had concerns about another patient who, according to the PDMP database, had never taken opioids before October 11, 2019, when Beauchamp started the patient on 30-milligram oxycodone tablets. That patient was J.T. .

31

123. Pickard stated that seemingly "all" of Beauchamp's patients receive 30-milligrams of oxycodone three times per day once they were titrated up to that level. She speculated that Beauchamp, alone, was the reason that the pharmacy kept auto-ordering more 30-milligram oxycodone tablets.

124. After hearing this information, the investigator asked Pickard whether there were any other Beauchamp patients who she had noticed were receiving troubling oxycodone prescriptions. She looked at records and then named ▇ M.P. ▇. Pickard stated that, according to her notes, she had called Beauchamp's office regarding prescriptions for 30-milligram oxycodone tablets Beauchamp had given to ▇ M.P. ▇. Beauchamp told Pickard that "the patient had been relocated" and "he believed the patient had been on therapy." However, Beauchamp had no documentation of ▇ M.P. ▇ having received oxycodone from some other provider before.

125. At the conclusion of the call, Pickard stated that she "knew there were more names" of patients receiving 30-milligram oxycodone prescriptions from Beauchamp. She offered to notify the ABME investigator if she identified more patients.

## 2. April 7, 2020 DEA Interview

126. Subsequently, on or about April 7, 2020, a DEA task force officer and I interviewed Pickard. Pickard stated that she was refusing to fill some prescriptions from Beauchamp because of concerns about the amounts of medication prescribed and the lack of diagnostic codes associated with the prescriptions. Pickard noted that she had previously provided all of the information about Beauchamp to the ABME.

## J. Evaluation of Criminal Histories and PDMP Reports of Patients Identified on March 2 and 5, 2020

127.    Thereafter, I and agents working with me obtained and evaluated criminal history and PDMP reports associated with the four patients mentioned during the March 2 call with SOI-1 and the March 5 call between the ABME investigator and the pharmacist. The following summarizes my findings (so as to better account for the total number of patients identified by SOI-1, I am continuing the numbering started above).

**18.**    M.C.

128.    M.C.    has a date of birth of     1983. According to state records, she resides in Montgomery. The criminal history database did not indicate that    M.C.    had any prior criminal history.

129.    According to the PDMP report, on April 17, 2015,    M.C.    received her first controlled substance prescription from Beauchamp—a prescription for 90 30-milligram oxycodone tablets. Next, on December 1, 2015,    M.C.    received an identical prescription from Beauchamp. Since that time, she has periodically received identical prescriptions. Between November of 2018 and February of 2020, she received an identical prescription each month. She received the most recent one on March 31, 2020. In total,    M.C.    received 34 prescriptions from Beauchamp, each one being for 90 30-milligram oxycodone tablets. M.C.    filled those prescriptions at three different pharmacies.

130.    The PDMP report did not reflect that    M.C.    filled any other controlled substances prescriptions in Alabama in the last five years.

131.    As noted, according to SOI-1, Beauchamp asked an employee to create a file for M.C.    on or about March 2, 2020. This seems significant, given that    M.C.    had been receiving regular controlled substances prescriptions from Beauchamp for almost five years before the date on which he asked an employee to create a file for her. I know that it is outside

33

the course of normal medical practice to prescribe maximum-strength Schedule II controlled substances to a patient for whom no file is kept.

19.    P.A.

132.    P.A.    has a date of birth of        1963.

133.    Criminal history databases did not indicate that P.A. had any prior criminal history.

134.    According to the PDMP report, P.A.  has not, in the last five years, filled any controlled substances prescriptions in Alabama. This is not surprising, given that P.A.  lack of history with controlled medications caused the pharmacist, Pickard, to telephone Beauchamp and then the ABME investigator. Based on the absence of entry in the PDMP report, it suggests that Pickard declined to fill the prescription for Pickard after Beauchamp was unable to explain the rationale. If this is the case, it would not be surprising. I know from my training and experience that pharmacists have an obligation to refrain from filling controlled substances prescriptions that appear to have been written outside the normal course of medical practice or for no legitimate medical reason.

20.    J.T.

135.        J.T.        has a date of birth of        1983. According to federal records, he resides in Montgomery.

136.    According to court records, on September 22, 2008, J.T.  was convicted of one count of bank larceny. He received a sentence of five years of probation.  See United States v. J.T.  ,                      .  On September 27, 2012, the United States Probation Office filed a motion to revoke  J.T.  probation. In the petition, the probation officer alleged that J.T.  had recently been convicted, in Tennessee state court, of possession of marijuana. The

34

petition stated that the state court had sentenced J.T. to 11 months and 29 days on that conviction. On November 1, 2012, the Court held a revocation hearing, found J.T. guilty of the violation, and sentenced him to one day in custody.

137.     According to the PDMP report, on October 11, 2019, J.T. received his first prescription from Beauchamp—a prescription for 80 30-milligram oxycodone tablets. Thereafter, on November 11, 2019, J.T. received a prescription from Beauchamp for 60 30-milligram oxycodone tablets. On December 30, 2019, J.T. received a prescription from Beauchamp for 90 30-milligram oxycodone tablets. Most recently, on February 4, 2020, J.T. received another prescription identical to the December 30, 2019 prescription. In total, J.T. received four prescriptions for 30-milligram oxycodone tablets from Beauchamp. J.T. filled those prescriptions at two different pharmacies.

138.     The PDMP report indicated that, before October of 2019, J.T. had received four short-term prescriptions for 7.5-milligram hydrocodone tablets. Each prescription was issued in 2017 and each one was issued by Dr. Kent D. Hill of Montgomery. According to publicly available information, Dr. Hill is a dentist. Therefore, these hydrocodone prescriptions do not appear to be related to the treatment provided by Beauchamp.

**21.**   M.P.

139.     M.P. has a date of birth of      , 1986.

140.     According to criminal history records, M.P. was convicted, in Michigan state court, of misdemeanor possession of marijuana. He received a sentence of 12 months of probation.

141.     According to the PDMP report, on March 22, 2016, M.P. received his first prescription from Beauchamp—a prescription for 90 30-milligram oxycodone tablets.

35

Thereafter, J.P. received almost monthly identical prescriptions from Beauchamp until his most recent prescription—issued on May 4, 2018. The only month in which J.P. did not receive from Beauchamp a prescription for 90 30-milligram oxycodone was February of 2017. In total, J.P. received 25 identical prescriptions. He filled those prescriptions at two different pharmacies.

142.    The PDMP report suggests that, before March of 2016, J.P. had not filled any controlled substances prescriptions in Alabama. On March 24, 2016—two days after he received his first prescription from Beauchamp— J.P. received a prescription from Dr. Jeremiah Parker for 30 7.5-milligram hydrocodone acetaminophen tablets. According to publicly available documents, Dr. Parker is a Montgomery dentist. It is unclear whether the hydrocodone tablets were for the same condition being treated by Beauchamp. However that is the only other controlled substance prescription J.P. received. Also notable, J.P. took the prescription from Dr. Parker to a pharmacy different than the two he used to fill the Beauchamp prescriptions.

## K.    Expert Evaluation of PDMP Reports

143.    During the past weeks, I consulted an independent medical expert licensed to practice medicine in the state of Georgia, Dr. Gene Kennedy. Dr. Kennedy has been qualified to testify in federal court on numerous occasions regarding the appropriateness of controlled substances prescriptions. He currently practices pain management, but previously maintained a general practice.

144.    Initially, I sent to Dr. Kennedy: (1) the PDMP reports associated with patients 1 through 16 listed in this affidavit; and (2) a report summarizing all of the controlled prescriptions Beauchamp issued in the last year.

145.    On or about March 10, 2020, I received a letter from Dr. Kennedy summarizing

his findings regarding the PDMP materials. The report is reproduced as follows:

March 10, 2020

S.A. Darryl Henton
Drug Enforcement Administration
Birmingham, Alabama

Dear Mr. Henton:                    RE: Case GL-20-0011

I have reviewed the PDMP documentation pertaining to Dr. Beauchamp.

In my opinion, the reports contain some findings that may be indicative of the non-
legitimate prescribing of scheduled medications.

In support of this assertion, I would note that of the individual patient PDMPs
reviewed:

- All patients received oxycodone 30 mg on their initial encounter, as far as the
  provided PDMP shows. (Attachments A through R)
- All patients ultimately received oxycodone 30 mg, #90 per month.
- 8 patients had received very short courses of lower dosage scheduled
  medications from other providers prior to presentation.    (Attachments A
  through E, G, H)
- 10 patients had NO previous oxycodone prescriptions present on their PDMP
  reports prior to presentation. (Attachments I through R)
- 4 patients had prescriptions filled at an alarming number of pharmacies.
  (Attachments G, L, N, O)

The one year PDMP was extensive. The document was 117 pages long. With this
in mind, I reviewed only up to the letter G, and have attached some examples of
remarkable findings.

I would note:

- 2 patients with the surname of Acreman frequently received scheduled
  medications within a day of each other, and occasionally on the same day.
  These medications   included   alprazolam,   clonazepam   and   Suboxone.
  (Attachment S)
- Patient   B   consistently   received   simultaneous   prescriptions   for
  dextroamphetamine and phentermine. (Attachment T)
- Patient   C   consistently received prescriptions for dextroamphetamine and
  alprazolam. (Attachment U)

- 3 patients who appear to be in the same family all received prescriptions for oxycodone 30 mg #90. At least 2 of these patients repeatedly received their prescriptions on the same day, and on one occasion, all 3 received prescriptions on the same day (Attachment V)
- 1 patient, <span>W.G.</span> consistently received <u>simultaneous</u> prescriptions for <u>buprenorphine, Soma, Diazepam, Dronabinol and methylphenidate</u>. (Attachment W)

### This is alarming.

It would be necessary to review individual patient charts to have a definitive, fully informed opinion as to whether these prescriptions were provided for a legitimate medical purpose and within the course of acceptable medical practice.

However, based solely on the PDMP reports provided the prescribing pattern is not reflective of what would be expected to be prescribed in an ordinary practice.

Please do not hesitate to contact me if you have any questions regarding my review of the PDMP reports.

Sincerely,

/s/Gene S. Kennedy

Gene S. Kennedy, M.D.

## L.    May 26, 2020 Contact with Source of Information

146.    On or about May 26, 2020, I received additional information from SOI-1. SOI-1 stated that, on or about May 21, 2020, between 2:00 PM and 5:00 PM, Beauchamp and another man, identified as " M " were discussing the physical records associated with the patients who received Suboxone, or buprenorphine from Beauchamp. SOI-1 overheard Beauchamp tell

M that he was going to start taking patient files associated with Suboxone patients to his (Beauchamp's) residence.

147.    SOI-1 also stated that Beauchamp had recently installed a new security camera in the file room at his medical office.

## M.    Expert Evaluation of Medical Files

38

148.    During the spring and summer of 2020, I sent to the medical expert, Dr. Kennedy, copies of patient records maintained by Beauchamp and obtained by way of the search warrants served on the electronic medical records providers. I asked him to review the records found in the Patient Now and Practice Fusion databases pertaining to three patients. Dr. Kennedy selected the records of         T.C.         ,         D.W.         and         T.S.         to review. He reviewed those records to assess whether the oxycodone prescriptions written to those three patients by Beauchamp were issued for legitimate medical purposes and within the normal course of professional medical practice.

149.    On or about July 1, 2020, I received a cover letter and three reports from Dr. Kennedy. Each report pertained to one of the patient files. Dr. Kennedy's findings are as set forth below.

150.    As for the cover letter, it was dated June 28, 2020. It stated, in part, "In reviewing the charts and PDMP documentation, I concluded that the scheduled prescriptions provided by Dr. Beauchamp were issued outside the scope of usual medical practice for each of the 3 charts. I also concluded that the scheduled prescriptions (oxycodone) were not provided for a legitimate medical purpose in each of the charts." In the conclusion section of the letter, Dr. Kennedy summarized his findings, stating: "The prescribing demonstrated in the 3 medical charts reviewed was perilous to the patients and to the community at large, outside the scope of usual medical practice and not for a legitimate medical purpose."

151.    In his report on the         T.C.         electronic files, Dr. Kennedy wrote, among other things: (1) "There was no diagnostic assessment of this patient"; (2) although the patient presented with a complaint of neck pain at her initial encounter, Beauchamp "did not do a neck examination"; (3) Beauchamp never documented a treatment rationale in the chart; (4)

39

Beauchamp never attempted to obtain past medical records; and (5) Beauchamp "provided an extraordinarily large number of oxycodone prescriptions that are unaccounted for." At the conclusion of the report, Dr. Kennedy stated, "As noted, this patient was provided with ongoing prescriptions for 30 mg oxycodone pills without encounter notes, credible examinations or any support whatsoever. In the absence of further, unreviewed physician documentation, in my view it would be impossible to support the prescriptions provided."

152. In his report on the <span>D.W.</span> electronic files, Dr. Kennedy wrote, among other things: (1) the physical examinations documented were not credible; (2) Beauchamp did not attempt to obtain past medical records; (3) Beauchamp did not request diagnostic studies to determine the cause of the "low back pain" reported by the patient; (4) Beauchamp "initiated oxycodone at 90 mg per day (135 MME) in an opioid naïve patient without a credible treatment rationale or treatment plan," which Dr. Kennedy stated "was perilous"; and (5) Beauchamp "provided a large number of oxycodone prescriptions that [were] not discussed in messages or in encounter notes." Dr. Kennedy concluded this report by stating that the prescriptions provided to <span>D.W.</span> by Beauchamp "were outside the course of usual medical practice and were not prescribed for a legitimate medical purpose." He noted that these prescriptions "represented a significant danger both to the patient and to the public at large," noting that "[a] fatal outcome would not have been surprising."

153. Last, in his report on the <span>T.S.</span> electronic files, Dr. Kennedy wrote, among other things: (1) Beauchamp "did not credibly obtain past medical records"; (2) Beauchamp "did not perform credible patient evaluations"; (3) Beauchamp "provided ongoing oxycodone prescriptions without documented encounters or meaningful physician follow-up"; and (4) Beauchamp "also provided this patient with a large number of oxycodone prescriptions

40

that <u>are unaccounted for</u>." Dr. Kennedy concluded this report by stating that the prescriptions

Beauchamp wrote to <span>T.S.</span> "were outside the course of usual medical practice and were not

prescribed for a legitimate medical purpose." He again noted that "[a] fatal outcome would not

have been surprising."

## N.     Recent Prescribing Records

154.    I have recently reviewed PDMP reports summarizing Beauchamp's prescribing of

controlled substances between April 2020 and the present. It appears, based on my review of

these reports, that Beauchamp stopped prescribing controlled substances entirely to the above-

listed patients sometime around late March or early April of 2020. I am not aware of the cause

of such discontinuation.

155.    Moreover, recent reports do not indicate that Beauchamp has recently prescribed

oxycodone to any of his patients. This marks a sudden and abrupt change in practice that is, to

date, unexplained.

## O.     Information Regarding Residence

156.    During the course of the investigation, I have determined that Beauchamp resides

at 1160 Laurel Brook Lane, Montgomery, Alabama 36117. I have done so through the following

means.

157.    First, I have obtained records from Alabama Power Co. related to the electricity

service provided to the premises to be searched. Those records show that the account is in

service under the name of Beauchamp. It has been in this state since on or about August 4, 2009.

The most recent bill, according to the records I obtained (which are dated June 19, 2020) was

issued on or about June 18, 2020.

41

158.     Additionally, on or about June 3, 2020, at around 7:00 AM, a DEA task force officer, another agent, and I began to conduct surveillance at the premises to be searched. At around 8:01 AM, the task force officer observed Beauchamp exit the side of the residence. He entered a vehicle parked at the residence and then departed. Agents followed Beauchamp from the residence to his office—he made no stops in between.

159.     At around 8:19 AM., a DEA special agent observed Beauchamp park the vehicle at the office of Obelisk Healthcare/Symmetry Medspa, located at 4705 Woodmere Boulevard, Montgomery, Alabama 36106. The agent observed Beauchamp exit the vehicle carrying a briefcase, walk to the building, and enter the building.

160.     I submit that there is probable cause to search the residence based on the following facts. First, as noted, SOI-1 reported overhearing Beauchamp say that he was moving medical records from his office to his residence. Second, as documented above, Beauchamp's residence appears to be the premises to be searched. Third, an agent observed Beauchamp carry a briefcase from his vehicle to his office after seeing Beauchamp leave his house, thus suggesting that Beauchamp carries work (including, possibly, medical records) home with him.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

161.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

42

162.     I submit that if a computer or storage medium is found on the PREMISES, there
is probable cause to believe those records will be stored on that computer or storage medium, for
at least the following reasons. First, according to SOI-1, Beauchamp maintained some electronic
medical records through Spring Charts. However, according to Spring Charts, the records
associated with Beauchamp's account are only accessible through a client-maintained server.
Accordingly, it is likely that such records may only be accessed through a forensic search of
Beauchamp's computers—including any computers he may have at his residence. Second, as
noted, SOI-1 reported that Beauchamp uses his phone to e-prescribe. Accordingly, records of e-
prescribing may be found only through a search of Beauchamp's telephone or other electronic
devices. Such telephones or electronic devices may be located at his residence. This is so given
that, as noted, an agent observed Beauchamp carry a briefcase into his office after leaving his
residence.

163.     Based on my knowledge, training, and experience, I know that computer files or
remnants of such files can be recovered months or even years after they have been downloaded
onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a
storage medium can be stored for years at little or no cost. Even when files have been deleted,
they can be recovered months or years later using forensic tools. This is so because when a
person "deletes" a file on a computer, the data contained in the file does not actually disappear;
rather, that data remains on the storage medium until it is overwritten by new data.

164.     Therefore, deleted files, or remnants of deleted files, may reside in free space or
slack space—that is, in space on the storage medium that is not currently being used by an active
file—for long periods of time before they are overwritten. In addition, a computer's operating
system may also keep a record of deleted data in a "swap" or "recovery" file.

43

165.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

166.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."
Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and print documents used in the drug trafficking scheme. There is reason to believe that there is a computer system currently located on the premises

167.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store

44

configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

           b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological

context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on

46

other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

168.    In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the

47

warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

169.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

170.    Because several people share the premises as a residence, it is possible that the premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the

48

things described in this warrant could be found on any of those computers or storage media, the

warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

171.    Based on the forgoing, I request that the Court issue the proposed search warrant.

172.    The warrant seeks authority to search electronic devices found on the premises.

Probable cause exists to search these devices in light of the fact that electronic medical records

are maintained on practice computers.

Respectfully submitted,

Subscribed electronically and sworn
to telephonically on July 20, 2020.
Darryl Henton
Special Agent
Drug Enforcement Agency

Sworn to before me this  20thday of July, 2020.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

49